FRANK DOUGHERTY and SEASIDE TRADING CORPORATION, Plaintiffs, *v.* ROCKAWAY OPERATING CO., INC., Defendant.

Supreme Court, Special Term, Queens County, April 20, 1936.

*James J. Crisona [Israel H. Perkin, James J. Crisona* and *David M. Palley* of counsel], for the plaintiffs.

*Breed, Abbott & Morgan [Hiram Thomas* and *William S. Pettit* of counsel], for the defendant.

MAY, J. The basis of the complaint of the individual plaintiff is that he is a tenant of the defendant and that the latter, by its acts and policy, has denied to him the fair and reasonable right of access to which he is entitled for himself, his guests and his invitees,

in that the defendant has prevented him from freely bringing in, or having brought in to him at defendant's bungalow colony in Rockaway Point, food, ice and other necessaries purchased by him from tradesmen outside of Rockaway Point, and has prevented and prohibited such persons from making deliveries, and that as a result thereof, plaintiff Dougherty has been compelled to make purchases from stores maintained in the aforesaid bungalow colony, paying therefor unreasonable prices; and that the defendant is pursuing a deliberate policy whereby competition in the supply of food and other necessary articles is being restrained and prevented contrary to the declared public policy of the State in order that the defendant may reap unwarranted profit thereby. The complaint of the corporate plaintiff is that it maintains a business in the vicinity of, but outside of the bungalow colony, that it has received orders for and made sales to the plaintiff Dougherty and other tenants of bungalows in the colony, has attempted to make delivery of same, but has been prevented by the defendant from entering the colony, because of defendant's unreasonable and unlawful regulations and charges, and thereby has been prevented from lawfully transacting its business because of the alleged attempt of the defendant to create a monopoly as aforesaid. An injunction is asked for and damages, in addition, are sought by the corporate plaintiff.

The defendant conducts on the sandy peninsula at Rockaway Point, on ground leased by it, but of which for the purpose of this discussion it may be regarded as the owner, a large bungalow colony (in fact, two colonies, but they will be regarded and treated herein as one) familiar to many residents of New York city. The peninsula and the colony are surrounded on three sides by water. On the fourth side, access, or at any rate vehicular access, is possible only through a gate maintained by defendant. The colony can be reached in either of two ways, by passenger ferry from Sheepshead Bay or by a State road which is adjacent to the aforesaid gate. Admission to the colony is unrestricted, except that persons coming by ferry must pay a transportation charge therefor, and those arriving by way of the State road and wishing to drive their automobiles into the colony must pay an admission charge or " parking fee " of fifty cents on week days and one dollar on other days. This fee entitles them to park their cars in one of the three parking spaces within the grounds set aside for such purpose. Lessees of the bungalows may procure the " parking " privilege by payment of the sum of five dollars a year.

The only road available for automobile use in the colony is a twelve-foot wide cinder road leading from the gate aforementioned

and running in a westerly direction, a branch of which leads to the ferry that goes to Sheepshead Bay, another branch of which leads to bathhouses on the ocean side of the property, and a third branch of which leads to one of the aforesaid parking spaces.

This road and its branches reach relatively few of the upwards of 2,000 bungalows and is a long distance from most of them. Access to these bungalows is afforded by miles of board walk or cement walk, intended for, and adapted to the use of, pedestrians only. None of these roads has ever been dedicated to the public use. The bungalow plots are not sold outright, but are leased under ten-year leases.

Certain types of trucks, such as those of large department stores, delivering merchandise to the lessees of the bungalows, are admitted to the colony without charge, as are trucks delivering merchandise to business tenants of the defendant. Outside tradesmen, other than these, however, are required to park their delivery trucks or vehicles in a parking space outside of the gate at a charge of one dollar and from that point make their deliveries on foot and by hand. It is with this latter practice that the plaintiffs herein are chiefly concerned.

The plaintiffs seek to establish a basis of legal complaint, as above stated, in the alleged restriction placed by the defendant on the individual plaintiff's implied easement of access to the demised premises by himself personally, or for his invitees, including tradesmen such as the corporate plaintiff. Concededly, he is not deprived of access on foot. His grievance arises from the so-called parking charge exacted of him, or of his invitees arriving in private automobiles, and the charge and restrictions imposed upon outside merchants with whom he might wish to do business.

While the streets and walks in the colony have not been dedicated to public use, I think it is not open to dispute that plaintiff-lessee would be entitled as a matter of law to necessary rights of access to the premises leased by him. Such right of access, or easement, however, would only be " co-extensive with the purpose to which streets in such localities are usually applied (*Buffalo, L. & Ry. Co.* v. *Hoyer*, 214 N. Y. 26), and, therefore, also subject to any restriction which might reasonably be expected to be placed upon the user of streets in such localities." (*Drabinsky* v. *Seagate Assn.*, 239 N. Y. 321, 326.) Manifestly, such rights of access would not be the same in a summer bungalow colony of this type, situated wholly on private property, and temporarily leased, as it would be where lots were sold or leased abutting on streets of the recognized type expressly dedicated to public use or impliedly dedicated to such use by a sale or lease from maps of the ordinary

subdivision. In this respect there is an essential difference herein from the situation as presented in the case of *Thousand Island Park Assn.* v. *Tucker* (173 N. Y. 203).

But, assuming that plaintiff had an implied right of unrestricted automobile access for himself and his invitees on said cinder roads of the colony, he is confronted, defendant contends, by the circumstance that his lease expressly binds him to accept and abide by certain rules and regulations, as well as additions to or modifications thereof, " not inconsistent with the terms of this lease, and which in its [landlord's] judgment, is for the best interests of all, and which, in its opinion, will best carry out the spirit of this lease and preserve its right."

From the proof adduced herein, I do not find that the regulations adopted by the defendant with reference to the uses of its parking spaces, and incidentally, its cinder roads, and the charge therefor was an unreasonable modification of the lease. Concededly, parking in the twelve-foot-wide roadways was impracticable. The cinder-surfaced roads are pathways clearly designed only to meet the necessities of the colony. They were evidently never intended as highways in the ordinary sense. The testimony showed that during the season the population of the colony was from 9,000 to 12,000 persons, exclusive of visitors, of which number about 4,000 were children. The reasons advanced by the defendant for the regulations, to wit, " increasing congestion of traffic, the danger to children therefrom, and the heavy wear and tear on the road," and the necessity of keeping the roads open and unobstructed for the use of fire apparatus, ambulances and the like emergency and service use, are reasonable arguments which cannot fairly be refuted, although plaintiffs contend that such reasons are a mere subterfuge.

It is undoubtedly true that if plaintiff had a vested right to use the road without charge, such right might not be taken from him under the guise of an addition to or modification of the rules. It may be that such charge as exacted from the individual plaintiff and his invitees other than the corporate plaintiff and similar tradesmen would be in violation of a vested right inasmuch as no such charge was made or agreed to when the lease was entered upon.

The difficulty with the individual plaintiff's position in this respect is that he seeks no specific relief on this score and offers evidence thereon merely to aid in establishing a scheme to create a monopoly. The complaint of the plaintiff Dougherty directs itself, as aforestated, to the parking fees or admission charges levied against tradesmen outside of the colony, the purpose of

which, he asserts, was to foster defendant's monopoly in the sale of certain articles of food and merchandise.

But here he is confronted with other provisions of the lease entered into by him with defendant. The relation of the individual plaintiff and the defendant is a contract one arising out of the lease, subject to additions or modifications read into it by law. Our political system favors the utmost freedom of contract between parties thereto, and our courts will hold them to the bargain they have made, if fairly entered into and not in violation of law or contrary to public policy. (See *Diamond Match Co. v. Roeber*, 106 N. Y. 473.) The situation herein must be considered from that viewpoint.

In paragraph third of the lease plaintiff covenanted: " That he will purchase all his supplies from the Landlord, or from such shops or markets as the Landlord shall establish or permit to do business at Rockaway Point, so far as such supplies are sold by the Landlord or by such shops or markets, and will obtain no such supplies from any other person or source on Rockaway Point, but he and members of his own family may personally bring their supplies with them to Rockaway Point, but neither the Tenant nor any member of his family or domestic establishment shall bring supplies to Rockaway Point for resale."

In paragraph sixteenth he covenanted: " That the Tenant will not conduct any business, trade or occupation, or perform service of any kind for compensation at Rockaway Point without prior written permission of the Landlord, and that no one having any goods or merchandise for sale at Rockaway Point, shall be allowed to enter Rockaway Point, even as guest, without the permission of the Landlord, and that neither the Tenant or any member of his family or domestic establishment will use the tenancy hereby created to conduct any business, trade or occupation of any description, or to engage even indirectly, in the sale of any articles or in facilitating the doing of any business at Rockaway Point contrary to the provisions hereof, and the Tenant agrees to report promptly to the Landlord every violation hereof coming to his notice, and covenants that he will not purchase any article within Rockaway Point from unauthorized persons or do any business with them."

In the foregoing contract between the parties lies the main distinction between the situation presented herein and that presented to the court in the *Thousand Island Park* case. As stated therein, " the exclusive privilege reserved by the landlord would fairly be a part of the consideration for the demise of the premises." The court in the *Thousand Island Park* case was not called upon

expressly to construe such a provision and it is plaintiffs' contention that regardless of the agreements entered into, inasmuch as they were conceived and designed to give the defendant a monopoly, they are contrary to the expressed public policy of this State as embodied in its statutes (Gen. Bus. Law, § 340; Penal Law, § 861), and must be swept aside.

The law is opposed to monopolies, but contracts in partial restraint of trade, where reasonable, do not fall within its condemnation. The courts, in construing what restraints are permitted and what are condemned, apply the test of whether or not the restraint imposed can be said to be, under all the circumstances, reasonable or unreasonable. A concise statement of principles applicable is that in *Barns* v. *Dairymen's League Co-Operative Assn., Inc.* (220 App. Div. 624), in which it was said: " Before it [the court] will condemn, there must appear the elements of injury to the public, or monopolistic control of a particular article of commerce, or unreasonable interference with and damage to the business of an individual, or the doing of illegal or unconscionable acts, or specific intent to do injury to someone else, or, in brief, at least some of the circumstances which would lead a court in good conscience to say that a given set of defendants were overstepping the bounds of reasonable ambition and fair play and becoming a nuisance to their fellow men."

Considering the proof adduced herein, I do not find that the defendant had or attempted to have a monopoly within the legal interpretation although unquestionably it sought to protect the lessees whom, for the benefit of its bungalow enterprise and the convenience of its lessees, it induced to come to its grounds at Rockaway Point. It had an unquestioned right to do this. (*Black & White Taxicab & Transfer Co.* v. *Brown & Yellow Taxicab & Transfer Co.*, 276 U. S. 518, and authorities therein cited.)

As stated by me at the conclusion of the trial herein, I have in mind that this is a summer colony where the business activities are confined practically to four months, in fact, ten weeks, and the people who have the stores for such period are called upon to compete with people outside of the colony who run stores for the whole year. It is doubtful if the part-time stores could compete on equal terms with the full-time stores. It is an absolute necessity that there be stores in Rockaway Point for the convenience and benefit of people who live at the Point, and they have to be protected to some extent.

Was defendant's conduct unreasonable under such circumstances? I do not think so. In the leases entered into with its store lessees (the ones attacked herein) it insisted on clauses of assurance that the prices charged would be fair and reasonable. The lease to the

Rockaway Point Stores, Inc., which drew the chief attention of the plaintiffs at the trial, contained covenants that the tenant would operate under a recognized system established by a whole-sale supply house which has received widespread approval; that its goods would consist of standard brands, or of articles of recognized high quality and that such goods and all staple articles would be sold at retail city prices (exclusive of chain store special sale prices), with other special clauses giving the landlord the right to check on and enforce these provisions. Other business leases contained similar provisions. Such leases, having been made for the benefits of defendant's bungalow lessees would be enforcible by them. (*Pond* v. *New Rochelle Water Co.*, 183 N. Y. 330.) The evidence offered by plaintiffs failed to a marked degree to establish their claim of excessive charges. Out of 4,100 items or more carried in defendant lessees' stores, testimony was offered as to some twenty items alone, and a number of these were of a clearly recognized variable nature, such as eggs, tomatoes and lettuce. The testimony as to the others, except as to newspapers, was con-flicting, uncertain and, to say the least, unconvincing. It failed to establish, to my mind, that any marked discrepancy in prices between stores in the colony and stores outside of it did in fact exist.

It is not disputed that tenants in the colony were not compelled to buy their supplies from the business lessees, with the exception possibly of such articles as ice and lumber and mason supplies. As to the former, the price charged in the colony was comparable to that charged outside, and as to the latter, testimony was offered on behalf of the defendant that tenants desiring to have such lumber and materials brought in for their own use might, on appli-cation to defendant's local office, have the truck admitted without paying a parking charge. As to ordinary food supplies and other articles of merchandise sold in the colony, tenants had the right to bring same in themselves or to have the same delivered, without restriction, from department stores, or by parcel post. The only complaint that the tenants might reasonably make would be that such method of delivery was not as convenient for them. It is significant, however, that out of the upwards of 2,000 lessees in the colony, none have joined in, or supported, this action except the plaintiff Dougherty and four others who testified in his behalf, although testimony showed that an attempt had been made to get as many of them as possible to do so. A large number of the ten-ants are combined in certain tenants' organizations at Rockaway Point, which organizations exercised a degree of supervision over the affairs of the colony. Such associations likewise passed on and approved the forms of defendant's lease, and the other leases.

Certain other contentions have been made herein, one by the defendant, that the plaintiffs do not come into this court of equity with clean hands. This is based upon the fact that the moving spirit behind the corporate plaintiff, one Saul, was himself a business lessee of the defendant, furnishing ice to the bungalow tenants, but was unable to come to satisfactory terms with the defendant on a renewal of this arrangement, and that the individual plaintiff formerly worked for Saul as a driver.

It is defendant's contention that the plaintiff corporation was organized merely for the purpose of bringing this suit, has no money and no business, and is prompted by improper and selfish motives, and that the plaintiff Dougherty lends himself to these purposes.

I realize that the plaintiffs come into this court not prompted by patriotic or generous impulses at all. They are motivated solely by selfish reasons, and it may be in order to benefit themselves financially or it may be to seek revenge in some form. They do not come into this court in a way that would appeal to the court. That, however, does not mean that they have not their rights to raise the issue as to whether or not the defendant is acting in a manner violative of public policy.

As to plaintiffs' contention that they have any legal redress under section 861 of the Penal Law, I am of the opinion that such section is clearly inapplicable to the present situation.

Viewed as a whole, the proposition herein resolves itself chiefly into a question of law. Whatever rights the plaintiff Dougherty, as a tenant, may have, are founded upon the agreement with the defendant. There is a provision in the leases to the storekeepers in the Point that in the event of complaint being made by any of the tenants of excessive charges, a hearing may be had and arbitration afforded to safeguard the interests of the tenants. It appears that complaints of this character were not made nor was arbitration sought, nor did either of the two civic organizations created by the tenants receive complaints from tenants or, as organizations, make protests about excessive charges.

Was the plan and scheme of the defendant, under the circumstances here present, in contravention of the statutes pertaining to monopoly?

I can see no resemblance between the plan devised and carried out by the defendants and monopolies which are condemned by court. There is no monopoly existing herein in the ordinary acceptance of the word, and nothing done by the defendant which appears unreasonable or unfair. Judgment for defendant. Submit findings and decree on notice.